## GREEN BAY AND MISSISSIPPI CANAL COMPANY *v.* PATTEN PAPER COMPANY.

PETITIONS FOR REHEARING.

No. 14.   Distributed January 16, 1899. — Decided February 20, 1899.

The petitions for rehearing rest upon a misapprehension of the decision in this case, the purport of which was to preserve to the Canal Company the use of the surplus waters created by the dam and the canal; but, after they had flowed over the dam and through the sluices, and had found their way into the unimproved bed of the stream, the rights and disputes of the riparian owners must be determined by state courts.

While the state courts may legitimately take cognizance of controversies between riparian owners concerning the use and apportionment of waters flowing in the non-navigable parts of the stream, they cannot interfere,by mandatory injunction or otherwise, with the control of the surplus water power incidentally created by the dam and canal now owned and operated by the United States.

Two petitions were filled on the same day for a rehearing in this case, decided November 28, 1898, and reported 172 U. S. 58.

The first was signed by *Moses Hooper*, Attorney, and *George*

*G. Greene* of counsel for the Patten Paper Company, and, omitting notes and citations of authorities, was in substance as follows.

The opinion herein shows that the plaintiffs below, defendants in error, did not make the leading facts respecting their water power plain. Hence they respectfully petition this honorable court for a rehearing upon the following grounds, being matters of fact only.

I. The claim of the original plaintiffs seems to have been lost sight of. This court says: "It is apparent from the conceded facts that the water power in question did not exist while the stream was in its natural condition, nor was it created by the erection of a dam by private persons for that sole purpose."

Plaintiffs below, defendants in error, should have made it appear, as the fact is, that the water power about which they are contending is created by a dam built by private persons, Mathew J. Mead and N. M. Edwards, riparian owners, in 1880, for the sole purpose of water power.

This dam furnishes a head of 12 to 18 feet. The mills on this power cost about seventy thousand dollars ($70,000). Under very like conditions mills have been built by riparian owners at the Grand Chute, costing over half a million dollars, and at Grand Chute Island, costing at least a million dollars, and at Kaukauna, below the improvements of the tenants of the Canal Company, costing over one hundred thousand dollars. All these investments are seriously threatened by the decision herein unless modified.

This private dam was across an unnavigable channel between islands three and four. Its legality cannot be questioned herein.

If its legality could be questioned by other parties, it cannot by the Canal Company, because, as complaint recites:

On August 1, 1881, it, as a riparian owner, leased to the Union Pulp Company, one of the plaintiffs below, a constant flow of about 20,000 cubic feet of water per minute, parcel of and to be drawn from said Mead & Edwards water power, for

hydraulic power, for a term of ten years, renewable for one hundred years, which leasehold interest said Union Pulp Company still holds. Said Union Pulp Company has erected on said lot a pulp mill worth about forty thousand dollars ($40,000) and now operates same, running same by said water power.

Original defendant Kelso, for whom Reese Pulp Company was afterwards substituted, stands in the same relation to the Canal Company.

An examination of the printed record will show that in many other respects the original plaintiffs, defendants in error, have failed to make the facts in this case apparent to this court.

II. This court seems to us to have held in 142 U. S. 254, at 269, 270, that it was necessary that there should be notice of taking while compensation could be had. No other view seems admissible.

The notice of taking held sufficient in 142 U. S. was given to the Kaukauna Water Power Company only. There is no pretence of notice of taking as against the original plaintiffs herein, or any of the owners on the Mead & Edwards power or middle channel. None of them were parties to that suit.

Speaking of this notice, Justice Brown said (p. 270): " Until this time there had been no active interference with any claim or riparian rights belonging to the Water Power Company."

Herein the original plaintiffs were, when action was commenced, ever since have been, and still are using their water power between islands three and four to run their mills. One of them, Union Pulp Company, is lessee of the Canal Company as riparian owner of part of this mill power.

The Canal Company united as riparian owner with the Patten Paper Company in leasing land and 1000 cubic feet of water per minute parcel of this Mead & Edwards, or middle power to Kelso (now Reese Pulp Company). Not only had Canal Company not given notice of taking, but it had recognized the title of the riparian owners on this middle power by leasing to Union Pulp Company, original plaintiff, parcel of such power, as riparian owner, and uniting with original

plaintiff Patten Paper Company as riparian owner in lease of parcel of this power to Kelso.

Compensation act of 1875 (18 Stat. 508) was repealed in 1888 (25 Stat. 4, 21). Hence, any notice of taking after 1888 is fruitless. There was no claim made by Canal Company to this middle power otherwise than as riparian owner, until filing of cross bill in 1890.

III. This mill power can be preserved without interfering with the use of all the water of the river, by the Canal Company, on its appurtenant lots from one to two thousand feet below the dam represented on sheet marked " Kaukauna " on Canal Company's maps. Such middle power may be supplied by the spent water of the upper mills mentioned on page 3, of printed copy of opinion. But if the Canal Company changes its plans and draws the water from the canal at lower points than now and heretofore, the water will be diverted from this middle power and the mills on it become valueless.

The judgment should provide that $\frac{62}{200}$ of the flow of the river, its proportion as partitioned, should, after being used by the Canal Company, be permitted to flow into the middle channel to feed the mills of riparian owners on that power, including lessees of the Canal Company.

If the judgment should follow the opinion unmodified, it might be construed to permit the Canal Company to violate its own leases to Union Pulp Company, original plaintiff, and George F. Kelso (now Reese Pulp Company), original defendant.

We cannot think the court would so determine in view of the facts evidently not sufficiently presented.

IV. We failed to make clear to the court another matter of fact. The court says : " It was found by the trial court that the Green Bay and Mississippi Canal Company has leased all of the water power created by the dam and canal, or arm of the dam, to be used over the water lots abutting on the canal."

We have not seen such finding of the trial court. The trial court did find that the Canal Company had leased all of the water power which it could find customers for, not that it had leased all the water power created by the dam and canal. The

Canal Company filed a schedule of its leases existing at the time of trial. This schedule, the company's own statement, shows leases of water to be used over the water lots abutting on the canal of only 860 horse power out of the 2500 horse power reserved. It also shows leases from the pond at the middle power below the dam, whereon are the mills of the original plaintiffs and whereon the canal company is a riparian owner of 900 horse power.

V. This power is one of those referred to by Colonel Houston in his report to the Secretary of War, accompanying arbitrators' report, wherein he says: "There is an immense water power in the lower Fox entirely independent of the works of improvement, part of which has been made available by works of private parties." This was not charged to the Canal Company by the United States.

We respectfully certify to this honorable court our full belief that the grounds assigned for the foregoing petition for rehearing are meritorious and well founded in law."

The second petition was signed by *John T. Fish* and *Alfred L. Cary*, as counsel for the Kaukauna Water Power Company and others; and by *Moses Hooper* and *George G. Greene* as counsel for original plaintiffs, defendants in error, and, with like omissions, was in substance as follows:

The defendants in error respectfully petition this honorable court for a rehearing herein, upon the following grounds:

I. There is no controversy respecting the ownership or control of the navigation of the Fox River by the United States. All the parties throughout the whole litigation have at all times and in all places conceded such ownership and control to be absolute and paramount. The judgment under review expressly recognized such ownership and control. In its first subdivision it only partitioned such of the waters of the river as were not required for the purposes of navigation. In its third subdivision it expressly limited the right of the defendants in error, as to the use of water below the dam, to such as was not or might not be necessary for navigation.

Neither the parties nor the state Supreme Court have sought to invade the empire of the United States over the navigation or commerce of this river.

II. The opinion states that "the decisive question in this case" is whether the water power . . . is subject to control and appropriation by the United States owning and operating those public works, or by the State of Wisconsin, within whose limits Fox River lies.

We do not understand that any question arises respecting the control of the water power by the State of Wisconsin. The State does not claim any control over or interest in it. The question in controversy seems to us to be, — Was the property of the riparian owners under United States patent to 12,600 horse power of water created by the fall of Fox River below the dam, taken away from such riparian owners without compensation by section 16, act of Wisconsin of August 8, 1848, saying, "Whenever a water power shall be created by reason of any dam erected, or other improvements made, on any of said rivers, such water power shall belong to the State, subject to the future action of the legislature"?

This is state legislation; it is the only foundation of the claim of the Canal Company.

The Canal Company makes no claim by virtue of any grant from the United States. It alleges that the dam and canal were constructed . . . under the act . . . approved August 8, 1848, and acts of the legislature subsequent thereto, other than which there was no authority for building and maintaining the same.

The controversy over the construction of this act arises between citizens of Wisconsin. Is not the construction of a local statute, in a controversy between its own citizens, a state question and not a Federal question? The State's construction of its own legislation between its own citizens is binding on this court.

We are not now questioning the jurisdiction of the court over this case, but only the power of the court to determine certain questions which are state and not Federal.

III. (a) On error to the state court in chancery cases

this court is concluded by the findings of fact by the court below.

(*b*) The opinions of the Wisconsin Supreme Court are a part of the record, made such by section 2410, Wisconsin Statutes of 1898, in force since 1870.

Such opinions must therefore be examined by this court as a part of the record to ascertain what the court below found as facts.

(*c*) On appeals in equitable actions the Supreme Court of Wisconsin retries the case upon the merits, so that its findings of fact are the ultimate findings in the case.

(*d*) When the Supreme Court of Wisconsin retried this case on appeal it had before it a full record of all the proceedings in the lower court, including all the evidence, findings, requests for findings, refusals and exceptions.

Some of the facts found by the Wisconsin Supreme Court are as follows:

*First.* Such court found that the State never took any of the water powers below the dam, and never granted any such water powers to the Improvement Company, or to the Canal Company.

This finding that the State did not take or own real estate below its dams, except what was taken for and occupied by the canal, really covers the whole question of fact as to its taking water powers below the dam. If it did not take any real estate below the dam, it took no water powers, for such water powers are part and parcel of the land itself.

The state Supreme Court found as a fact that the water power created by the dam at Kaukauna was about 2700 horse power, and that on the rapids below the dam there was 12,600 horse power. These findings, together with the report of Major Houston, show it to be a conclusive fact that the State never took any of the water powers below the dam, and that the Canal Company, at the time of the arbitration for the sale of the improvement to the United States, only claimed to own at Kaukauna 2500 horse power, which is a little less than that found by the state Supreme Court to be created by the dam.

From that finding and the evidence supporting it, it is clear

that the water powers below the dam were never taken by the State, and were never treated by the State, the Canal Company or the United States, as the source of a fund expended, or to be expended, in the completion and maintenance of the public improvement.

IV. The water powers reserved to the Canal Company in its deed to the United States were only those which the arbitrators had valued at $140,000 and the title to which was already in said company.

All water powers reserved in the deed were granted to the Canal Company by the State, through state legislation, presenting only state questions, which we respectfully submit are not reviewable by this court upon this writ of error.

V. If we may be permitted to do so, we desire to suggest that the conclusion expressed in the following language of the opinion, viz., "It is apparent from the conceded facts that the water power in question did not exist while the stream was in its natural condition," is not strictly accurate. While it is true that in the natural condition of the stream the water power in question (being that below the dam) did not exist in its most available form, yet that it did exist in its most essential and valuable feature as a property right, viz., in the natural fall of 42 feet from the head to the foot of the rapids, is too clear for controversy. Were it not for this natural fall there would be no water power; with it a power exists, which can be fully developed for use at small cost. It also exists in that part of the stream which the state Supreme Court found, as a fact, had never been navigable, and recognized the right of the riparian owner to place structures to make available the natural power, so long as such structures do not materially or unreasonably interfere with the public right.

VI. We failed to make clear to the court another matter of fact. The court says: "It was found by the trial court that the Green Bay and Mississippi Canal Company has leased all of the water power created by the dam and canal, or arm of the dam, to be used over the water lots abutting on the canal." This is only true in the sense that the Canal Company had leased all of the water power which it could find

customers for, not that it had leased all the water power "created by the dam and canal." The Canal Company filed a schedule of its leases existing at the time of the trial of this cause. This schedule, the company's own statement, shows leases of water "to be used over the water lots abutting on the canal" of only 860 horse power out of the 2500 horse power reserved. It also shows leases from the pond at the middle power below the dam, whereon are the mills of the original plaintiffs and whereon the Canal Company is a riparian owner, of 900 horse power.

On and prior to October 1, 1880, the Canal Company had leased only 230 horse power to be used over the water lots abutting on the canal.

VII. This court says: "It is apparent from the conceded facts that the water power in question did not exist while the stream was in its natural condition, nor was it created by the erection of a dam by private persons for that sole purpose." It should have been made to appear that a part of the water power involved in this contention is created by a dam built by private persons, Mathew J. Mead and N. M. Edwards, riparian owners, in 1880, for the sole purpose of a water power. The Kaukauna Water Power Company, principal defendant herein, is a riparian owner of part of this power, being the owner of three fourths of the residue after the separation therefrom of certain parcels leased to one of the original plaintiffs, the Union Pulp Company, and to one of the defendants.

VIII. This court held, in 142 U. S. 254, at 269–70, that it was necessary that there should be notice of taking while compensation could be had.

The notice of taking held sufficient in that case only related to the withdrawing of water from the pond held by the government dam and not to the use of water on the various channels of the river below the dam.

Speaking of this notice, Mr. Justice Brown said: "Until this time there had been no active interference with any claim or riparian rights belonging to the Water Power Company."

This notice did not in any way relate to the water power

here in contention, which is that created by the fall of the river below the government dam. As to that water power, there has been no notice of taking; on the contrary, the Canal Company has recognized the riparian ownership by acting as a riparian owner itself and by uniting as a riparian owner with other riparian owners in leases of power created by the Mead and Edwards' dam above referred to.

IX. The case of *Kaukauna Co.* v. *Green Bay &c. Canal Co.*, 142 U. S. 254, between some of the parties to this suit, and relating to water power and other rights on this river at Kaukauna, settles so many questions applicable to the case at bar that we take the liberty of calling attention to it. Many of the rights of the defendants in error are there clearly defined and settled. Among these are the following:

(1) The state Supreme Court found as a fact that the river between the dam and slack water below is rapids and had never been navigable. As to this part of the river the rights of the riparian owners to the use of the water for hydraulic purposes, and to erect structures in the bed of the stream to develop such uses, is fully recognized by the above decision.

(2) The state Supreme Court found as facts that the ordinary flow of the river is 300,000 cubic feet a minute, and that a flow of only 1000 cubic feet of water a minute is required for the use of the canal for the purposes of navigation during the season of navigation. The diversion of the remaining 299,000 cubic feet of flow of water per minute from the riparian owners below the dam for hydraulic power would seem to be for the express or apparent purpose of obtaining water power to lease to private individuals, and not as an incident to the public improvement below the dam, viz., the canal.

(3) The taking by the State of the 12,600 horse power, found by the state Supreme Court to exist upon the rapids below the dam, would seem to be for private purposes only, and not as an incident to the public improvement, and to be thoroughly condemned by the decision which we have just quoted.

X. This decision goes very far towards overruling all former decisions respecting riparian rights upon public rivers. It practically denies the existence of such right, as against the claim of the State, to take the waters of the public rivers for private purposes, hydraulic power.

The decision may also work a public calamity to the cities of the Fox River valley. Its effect may embrace the water powers upon the whole line of the improvement, extending from Lake Winnebago to Green Bay, many of which have heretofore been possessed and enjoyed by parties other than the Canal Company under a supposed ownership. The decision may be so construed as to give all of the water powers throughout the whole line of the improvement to the Canal Company and place all of the industries of the Fox River valley depending upon water powers (and there are many) under contribution to that company.

We most respectfully submit this petition to this honorable court and ask it to grant a rehearing herein, and certify that in our judgment the grounds assigned therefor are meritorious and well founded in law and in fact.

Mr. Justice Shiras delivered the opinion of the court.

This is a petition, by the defendants in error, for a rehearing of the case of *Green Bay and Mississippi Canal Co.* v. *Patten Paper Co. and others*, decided at the present term, and reported in 172 U. S. 58.

The reasons set forth in the petition and accompanying brief seem to go upon a misapprehension of the scope and meaning of the decision of this court.

Thus it is made matter of complaint that this court did not deal with questions concerning the division of the waters of Fox River after they had spent the force or head given them by the dam and canal, and had passed into a non-navigable portion of the stream below the improvement; and it is suggested that we overlooked the fact that a private dam had been constructed between islands three and four.

But those are questions to which the jurisdiction of this

court does not extend, and hence could not be considered by us. The purport of our decision was to preserve to the Green Bay and Mississippi Canal Company the use of the surplus waters created by the dam and canal. After such waters had flowed over the dam and through the sluices, and had found their way into the unimproved bed of the stream, the rights and disputes of the riparian owners must be determined by the state courts.

Again, apprehensions are expressed lest the decision in the present case may be construed so as to injure parties using water powers at other places in the river, and who are not represented in the present controversy.

We are not ready to presume that the authorities of the United States will either permit or make changes in the places where the surplus waters are to be used by the Green Bay and Mississippi Canal Company, so as to deprive other parties of the water powers they have been using for so many years, unless such changes are found to be necessary and proper in the regulation and delivery of the surplus waters created by the public improvement. But such questions are not now before us.

While the courts of the State may legitimately take cognizance of controversies between the riparian owners, concerning the use and apportionment of the waters flowing in the non-navigable parts of the stream, they cannot interfere by mandatory injunction or otherwise with the control of the surplus water power incidentally created by the dam and canal now owned and operated by the United States.

The petition for a rehearing is

*Denied.*